### Charles H. Ferry v. George W. Miltimore et al.
### Chicago Tire and Spring Works v. Same.

1. CONTRACTS—*Construction of.*—The meaning of an agreement is to be found in its words, and read in the light of surrounding circumstances.

2. EQUITY PRACTICE—*No Affirmative Relief on an Answer.*—Affirmative relief in chancery can not be given upon an answer.

3. SAME—*Adjusting Accounts.*—Courts will not waste their time in adjusting the particulars of a long and intricate account—a business which is the peculiar province of a commissioner and accountant.

**Bill to Adjust an Account.**—Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding. Heard in this court at the March term, 1896. Reversed and remanded with directions. Opinion filed June 11, 1896.

GREEN, ROBBINS & HONORE, attorneys for appellants.

PECK, MILLER & STARR, attorneys for appellees.

MR. PRESIDING JUSTICE GARY DELIVERED THE OPINION OF THE COURT.

Miltimore was the chief man of, and gave name to, the Miltimore Elastic Steel Car Wheel Company, a manufacturing corporation in Vermont.

The dealings which are the subject of controversy here be-
gun, as shown in a document, are as follows:

"CHICAGO, March 23, 1883.
The Chicago Tire & Spring Works,

DEAR SIRS: We hereby agree to purchase from you the
undermentioned car wheel tires, viz.:

100 Tires 30 in. outside dia., 2½ in. thick.
600 " 33 " " " 2½ " "
300 " 42 " " " 2¼ " "

Price 5¼ cts. per lb. f. o. b. Chicago.
Terms cash 30 days.

Delivered in lots as required on or before the 1st day of
January, 1884. You have the option of delivering double the
quantity and in above proportion at same price and terms.

THE MILTIMORE ELASTIC STEEL CAR WHEEL CO.,
O. B. 52.                By H. PENNOCK, President.
53 Dearborn St."

On the back as follows:

"Blooms to be of Cammel Manfgr. & Siemens-Martin
Steel.

F. M. ATKINSON, Prest."

Atkinson was president of the Tire Company. Twelve
hundred and twenty-eight tires were delivered. A large
part of them were made of steel inferior to the kind speci-
fied. Quarrels arose between the parties about many things
—other dealings, as well as the tires. Ferry was largely
interested in the tire company, and also had individual deal-
ings with the appellees.

Miltimore, in August, 1884, wrote to his own employe
that "in the first place there is something radically wrong
with their tires. We are having them tested. Farnum
says they are nothing but high carbon Bessemer steel which
we can buy delivered N. Y. for 3½ per pound. * * *
My opinion is about one-half of these tires are Bessemer; the
other half is open hearth. We have been turning all of these
tires, and we find a part of them very short; the chip breaks off
short, showing the metal is lacking of tenacious qualities;
the other half turned up like Midvale tire, long chips, tough
and hard."

And in December, 1884, in an affidavit, he stated that the tires were of an inferior quality, and of poor metal, and gave very small mileage, and were inferior to any open hearth tire in use * * * and of much poorer quality than said tire works promised and agreed;" with much other depreciation of the quality of the tires.

Litigation was pending between the parties.

In this condition of affairs an agreement consisting of thirteen articles, and occupying here nearly six printed pages of the abstract, was made January 12, 1885, portions of which are as follows:

"Memorandum of agreement, entered into between Charles H. Ferry, party of the first part, The Chicago Tire and Spring Works, party of the second part, The Miltimore Elastic Steel Car Wheel Company, party of the third part, and George W. Miltimore, party of the fourth part.

WHEREAS, the above parties are desirous of settling all suits and differences now existing between them, it is now mutually agreed between them as follows:

II. An accounting shall be taken of the steel tires actually delivered by the party of the second part to the party of the third part, under contracts executed on or about the 23d day of March, 1893, including 508 33-inch tires hitherto delivered at Garfield, Illinois, which tires shall be surrendered by the party of the second part to the party of the fourth part f. o. b. Chicago, free from all liens and charges, except the necessary charges of handling and storing the same. Also 176 42-inch tires manufactured but not delivered, which shall be delivered by the party of the second part to the party of the fourth part, free from all liens and charges, f. o. b. Chicago.

Interest shall be added to the purchase price of the tires delivered at seven per cent per annum, commencing to run thirty days after date of delivery.

IX. It is agreed that the party of the fourth part, the party of the third part, or any corporation which shall become its successor and carry on the business of the party of the fourth part, shall purchase and take when manufactured

into tires the balance of the blooms purchased and held by the party of the second part, for the purpose of carrying out the contracts entered into on or about the 23d day of March, 1883, between the party of the second part and party of the third part, in such quantities and at such times as the business of said party of the fourth part and party of the third part, or its successor, shall demand; and it is agreed that no other tires shall be used in said business unless specially directed by purchasers of wheels. If any specifications shall be made by purchasers of wheels for other makes of tires, the party of the second part shall be notified thereof and given ample opportunity of arranging with such purchasers for the use of tires manufactured out of said blooms.

VII. If any tires furnished by the party of the second part to the party of the third part or the party of the fourth part shall prove defective in manufacture or quality of material, the party of the second part agrees to make good any expense or loss necessarily incurred by the party of the fourth part in remedying defects in the manufacture of any such tires, and to save harmless the party of the third part and party of the fourth part from any claims made by the purchasers of wheels on account of defects in the material or manufacture of such tires."

I transpose articles 7 and 9, as the order seems to me more appropriate.

Now the main question between these parties is whether the whole remedy of the appellees for defects in the tires is under article 7, and limited by the words of that article.

We lay out of view the construction placed by the appellees upon some testimony by Ferry as to the object and meaning of the agreement, as well as all prior negotiations.

The meaning of the agreement is to be found in its words, read in the light of surrounding circumstances. Davis v. Sexton, 35 Ill. App. 407; Smith v. Brown, 5 Gilm. 309; Benjamin v. McConnel, 4 Gilm. 536.

It is clear that the parties intended that the agreement

Ferry v. Miltimore.

should embrace the whole subject of their relations to each other; they were "settling all suits and differences" between them.

Miltimore knew there were defects in the steel; yet he agrees that he and his corporation—and he seems absolutely to control it—or any successor to it, shall purchase and take the tires that might be made of the steel on hand; and to secure himself and his corporation against loss, he took the agreement of Ferry and his corporation to make good any expense " necessarily incurred in remedying defects in the manufacture,"   *   *   *   " and to save harmless " against claims by purchasers for " defects in the material or manufacture."

Provided no expense was incurred in remedying defects in manufacture, and appellees were not damnified by claims of purchasers for defects in material or manufacture, he showed no anxiety or care as to the intrinsic quality of the tires themselves.

The tires were to be sold on wheels. If they could be put on the wheels without extra expense, and the purchasers did not complain, how well the wheels wore did not concern him, and it seems did not concern Ferry either. They were equally indifferent.

This being the case, the appellants should be charged only with such expense actually incurred, and claims of purchasers sustained.

And all the tires "furnished" from the beginning of the dealings come under the same provisions as to expense and claims.

"Furnished" by itself is ambiguous. Alone it is elliptical. The auxiliary verb must be understood; and as some of the tires were in use on wheels—many had been delivered, but not yet on wheels, some already made, not yet delivered, and others to be made—there was the same reason for extending the provisions to the past as to the future, and *vice versa*. The meaning is, "if any tires" which have been or may be "furnished."

The court below acted upon these principles as to the

1,228 tires delivered before the agreement was made, but, as to the tires mentioned in article two of the agreement, held that they were not such as should have been delivered, and that therefore the appellees should not be charged with them, and should be credited with freight paid on them. If the agreement was made under any mistake of fact as to the quality of the tires mentioned in article two, the bill filed by Miltimore should not have been—as this was—for relief under the agreement. The bill contains no allusion to the terms under which dealings began, no reference to the document of March 23, 1883, and yet the decree, if it has any basis as to the tires mentioned in article two, must be on the theory that the guaranty implied by the words on the back of that document remained in force, notwithstanding the full settlement of "all suits and differences between them," and regardless of the fact that the Wheel Company was, at the time the agreement was made, alleging the inferior quality of the tires as the cause of action in one suit, and of defense in another.

This bill was filed October 25, 1886, and there was no allusion in any pleading in the case to the original document, "23 March, 1883," until May 11, 1888, and then only in an answer to a cross-bill of Ferry. Relief can not be given on an answer. King v. Cooper, 134 Ill. 183.

. The decree is reversed and the cause remanded, with directions to the Circuit Court that an account be stated anew, in which account the appellants shall be allowed the purchase price of all tires delivered, and charged only in accordance with the words of article seven.

No other objections to the decree are argued, and if there were, we are not in duty bound to go through items in an account. When the State of Virginia contained something like three-fourths as many people as are now in Cook county, with possibly not one-fourth as much business in the Court of Appeals of that State as now comes to this court, that court said of themselves: "Without wasting their time in adjusting the particulars of a long and intricate account—a business which is the peculiar province

of a commissioner and accountant—and which, if this court were to admit themselves to be bound to engage in, would in a year or two put a total stop to the administration of justice in civil causes in this commonwealth." Perkins v. Saunders, 2 Hen. & Mun. 420. Reversed and remanded, with directions.